IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | **Case No.: 23-MJ-335** |
| : | |
| v. : | **18 U.S.C. § 111(a)(1)** |
| : | |
| **TANYA BISHOP,** : | |
| : | |
| Defendant. : | |
| : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Tanya Bishop, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.   The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.   On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5. At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8.      Shortly after 3:00 p.m. on January 6, 2021, Tanya Bishop ("Bishop") and Curtis Davis ("Davis") entered the U.S. Capitol building through the East Rotunda doors. Bishop and Davis quickly advanced into the Rotunda where members of the Metropolitan Police Department ("MPD")

and United States Capitol Police ("USCP"), many of whom were outfitted in helmets, face-shields, and additional body-padding, or "riot gear" were attempting to disperse a large crowd of rioters.

9. At approximately 3:07 p.m., Bishop and Davis were up against a line of MPD officers inside the Rotunda. At that time, Davis and other rioters attacked MPD Sergeant M. H.

10. While confronting officers in the Rotunda, Davis aggressively yelled at the officers, and at one point, was physically held back by Bishop.

11. At approximately 3:10 p.m., MPD Officer R. D. continued to try and disperse rioters in the Rotunda. Officer R. D. attempted to move Bishop several times, however Bishop refused to move back and held onto Officer R. D.'s baton, thereby making physical contact. Bishop said to Officer R.D., "you can't turn on Americans" and then grabbed Officer R.D.'s police baton with both hands. In grabbing Officer R.D.'s baton, Bishop acted knowingly, and with the with the intended purpose of obstructing, impeding, and interfering with Officer R.D.'s efforts to disperse Bishop and the other rioters from the Rotunda. Shortly thereafter, another officer pushed Bishop away from Officer R. D. Bishop continued to obstruct and resist the MPD Officer with physical contact by grabbing the MPD Officer's wrist, while he and other officers were attempting to control the crowd and clear the Rotunda area of the Capitol.

12. Officers continued to push rioters out of the Rotunda, but Davis and Bishop did not comply. At approximately 3:18 p.m. Bishop – assisted by Davis - forcibly pulled a riot shield from the hands of another police officer at the entryway to the Rotunda, thereby making physical contact with the officer.

13. After the shield was pried from the officer's hands, Davis took control of the shield and between approximately 3:19 p.m. – 3:20 p.m., Davis forcibly pushed the large surface area of the shield against the backs of a line of rioters directly confronting police and applied his strength

and bodyweight to the push against the rioters who were at the police line, thereby pushing the officers and rioters forward into the Rotunda, which was directly contrary to what the police were trying to accomplish.

14. Eventually, police were able to push Bishop and Davis out of the Rotunda. After being pushed from the Rotunda, Bishop and Davis remained in the foyer area between the East Rotunda Doors and the Rotunda where other rioters continued to battle police. Davis and Bishop had to be cleared from the building by police officers through the East Rotunda Doors at approximately 3:35 p.m.

15. Bishop and Davis returned to the East Rotunda Doors at approximately 3:41 p.m. Bishop was at the front of the crowd and stepped back into the foyer area and confronted the officers. Bishop was pushed from the building by police, but continued to attempt to push back in with members of the crowd. At one point, police officers held up riot shields blocking the open door. Bishop forcibly pushed her bodyweight into one of those riot shields and thereby made physical contact with the officer carrying that shield. After this attack, Bishop was one of the last rioters to retreat, only after police officers continuously deployed chemical irritants at the crowd for several seconds.

16. After exiting the Capitol building, Bishop climbed on top of a law enforcement vehicle and yelled to the crowd through a megaphone. Bishop encouraged others to remain in the Capitol building and asked other rioters that were walking away from the Capitol Building, "Why is everybody walking the wrong way?" Bishop further stated, "this is our one chance" and "I'm ready to go back in, because this is our fucking building." Davis observed Bishop doing this and filmed her on a cell phone.

### *Elements of the Offense*

17. The parties agree that Assaulting, Resisting and Impeding Certain Officers under 18 U.S.C. § 111(a)(1) requires the following elements:

   a. The defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer from the Metropolitan Police Department.

   b. The defendant did such acts forcibly.

   c. The defendant did such acts voluntarily and intentionally.

   d. The Metropolitan Police Department officer was assisting officers of the United States who were then engaged in the performance of their official duties.

   e. The defendant made physical contact with the officer and acted with the intent to commit another felony. For purposes of this element, "another felony" refers to the Civil Disorder offense charged in the criminal complaint, 18 U.S.C. § 231(a)(3).

### *Defendant's Acknowledgments*

18. The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that she voluntarily, intentionally, and forcibly assaulted an officer from the Metropolitan Police Department by pulling a riot shield away from that officer while the riot shield was in the officer's hands. Further, that officer was assisting officers of the United States who were then engaged in the performance of their official duties. The defendant further admits she made physical contact with the officer and acted with the intent to commit another felony, that is Civil Disorder under 18 U.S.C. § 231(a)(3).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

|     |     |
| --- | --- |
| By: | s/ Kyle R. Mirabelli |
|     | Kyle R. Mirabelli |
|     | Assistant United States Attorney |
|     | NY Bar No. 5663166 |
|     | Capitol Siege Section |
|     | U.S. Attorney's Office |
|     | District of Columbia |
|     | Telephone No: (212) 252-7884 |
|     | Email Address: kyle.mirabelli@usdoj.gov |

## DEFENDANT'S ACKNOWLEDGMENT

I, Tanya Bishop, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: June 18TH 24    *Tanya Bishop*
                      Tanya Bishop
                      Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 6/18/2024    *Renae Alt-Summers*
                   Renae Alt-Summers
                   Attorney for Defendant