UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 24-cr-299 (APM) |
| TANYA BISHOP | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For her conviction of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), the government concurs with the United States Probation Office and requests that this Court sentence Defendant Tanya Bishop to 24 months of incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $100.

### I.    INTRODUCTION

The Defendant, Tanya Bishop, violently participated in the January 6, 2021 attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Just after 3:00 p.m., Bishop stormed into the U.S. Capitol through the East Rotunda Doors and impeded and interfered with multiple police officers inside and around the Rotunda. She did so by attempting to grab an officer's baton, pulling a riot shield from the hands of another officer with assistance from her co-defendant, and, after being forced from the building, trying to forcibly push her way back inside past officers. While outside on the East Front, Bishop climbed on top of a police vehicle and yelled to the other rioters through a megaphone, encouraging them to stay. Bishop further stated, "this is our one chance" and "I'm ready to go back in, because this is our fucking building."

The government recommends that the Court sentence Bishop to 24 months of incarceration. A 24-month sentence reflects the gravity of Bishop's conduct, but also acknowledges her admission of guilt and the compelling mitigating factors detailed in the PSR.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense, *see* ECF 35, for a short summary of the January 6, 2021 attack on the United States Capitol.

### B.  Bishop's Role in the January 6, 2021 Attack on the Capitol

Bishop attended the rally at the Ellipse on January 6 and recorded a portion of President

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Trump's speech. In the recording, President Trump said, "Mike Pence is going to have to come through for us" and Bishop cheered "Yeah!" in response. President Trump continued "And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution. Now it is up to Congress to confront this egregious assault on our democracy. And after this we're gonna walk down, and I'll be there with you, we're gonna walk down . . . to the Capitol!" Bishop cheered "Yeah!" in response. President Trump went on "And we're gonna cheer on our brave Senators and Congressmen and women and we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness, you have to show strength and you have to be strong. . ."

Shortly after 3:00 p.m. on January 6, 2021, Tanya Bishop entered the U.S. Capitol building through the East Rotunda Doors, with her co-defendant, Curtis Davis ("Davis")[2], during a full-blown riot. Bishop and Davis quickly advanced to the Rotunda, where officers of the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD") were attempting to disperse a large, combative crowd of rioters. The USCP and MPD officers were outfitted in helmets, face-shields, and additional body-padding, or "riot gear."

At approximately 3:07 p.m., Bishop stood close to a line of MPD officers inside the Rotunda as Davis tried to pull a baton away from Sergeant M.H.

---

[2] On October 18, 2024, Davis was sentenced in case number 1:24-cr-00198 (APM) to 24 months incarceration followed by 36 months' supervised release, with the first 6 months of supervised release to be served on home detention. Additional terms of Davis's supervised release include compliance with mental health and substance abuse treatment as directed, completion of 100 hours of community service, and payment of $2,000 of restitution.



***Government Exhibit #1 at 00:05: Bishop (blue circle) near police line as Davis (red circle) and other rioters attack police***

Less than two minutes later, MPD Officer R.D. attempted to disperse rioters inside the Rotunda. Officer R. D. specifically attempted to move Bishop away from the police line several times, but Bishop refused to move back. Instead, she grabbed and held onto Officer R.D.'s baton with another rioter. During this time, Bishop stated that the officers were "on the same side" as the rioters, *i.e.*, they were against "crooked politicians." She then stated, "you can't turn on Americans" and put both hands on Officer R.D.'s police baton. Another officer then pushed Bishop away from Officer R. D., causing Bishop to lose her grip on the baton.



*Government Exhibit # 2 at 1:14: Bishop (blue circle) grabbing Officer R.D.'s baton*



*Still Image # 1: Another officer pushed Bishop away from Officer R.D.*

Later on, Bishop physically held back Davis as he aggressively yelled at officers.[3]



*Still Image # 2: Davis (red circle) being held back by Bishop (blue circle)*

As the officers continued to push rioters out of the Rotunda, Bishop and Davis continued to push back. As shown below in Government Exhibit #3, Bishop and Davis had to be forcibly removed from the Rotunda by police.

---

[3] Shortly thereafter, Davis punched an officer in the helmet and face-shield.



***Government Exhibit # 3 at 00:01: Bishop (blue circle) and Davis (red circle) being pushed from the rotunda by police officers***

At approximately 3:18 p.m., Bishop grabbed hold of MPD Officer M.L.'s riot shield and pulled on it as the officer pushed her from the Rotunda. Another rioter and Davis then also grabbed the shield and forcibly ripped it from the officer's hands. Immediately thereafter, Davis forcibly pushed the shield against the backs of a line of rioters confronting police, adding his strength and weight to the collective thrust against the police line.



*Government Exhibit # 4 at 1:29: Bishop (blue circle) pulling riot shield as Davis (red arrow) prepares to join[4]*

---

[4] Government Exhibit # 5 from 00:15 until 1:40 shows this event from a different angle.



***Government Exhibit # 3 at 1:50: Davis (circled in red) pressing shield (red arrow) into
the backs of rioters pushing police backward into the Rotunda***

After officers pushed Bishop and Davis from the Rotunda, the pair remained in the foyer
area between the East Rotunda Doors and the Rotunda where other rioters continued to battle
police. Bishop and Davis were some of the last few rioters expelled from the building around this
time. Bishop resisted police efforts to clear the area, and at one point, tried to walk past officers
further into the Capitol. Eventually, officers were able to usher Bishop and Davis from the building
through the East Rotunda Doors at approximately 3:35 p.m.

After briefly retreating, Bishop and Davis returned to the East Rotunda Doors at
approximately 3:43 p.m. Though by that point the police had successfully cleared the Rotunda and
adjoining hall, rioters were still attempting to force their way back into the building. The police
held the rioters back with riot shields and chemical irritants. Bishop made her way to the front of

the mob of rioters outside of the doors and unsuccessfully tried to push her way back into the building for several minutes.



*Government Exhibit # 6 at 4:39 Bishop (blue circle) pushing against police shield*

After her attempt to reenter the building failed, Bishop climbed on top of a nearby police vehicle and yelled to the crowd through a megaphone as Davis recorded her. Bishop encouraged others to remain in the Capitol building and asked other rioters that were walking away from the Capitol Building, "Why is everybody walking the wrong way?" Bishop further stated, "this is our one chance" and "I'm ready to go back in, because this is our fucking building."



*Government Exhibit #7 at 00:56: Bishop (blue circle) on police vehicle with megaphone*

### C.  Bishop's Post January 6 Statement

During her arrest on December 8, 2023, Bishop made several statements regarding law enforcement and her conduct on January 6. For example, she said "The FBI . . . they're not bad people, just the top, at the top. It's the top of everything! It's also our Constitutional duty when a government is no longer working for the people to replace them." She also claimed that she was "pushed into the building," that she rendered aid to an officer who was pepper sprayed, and that she shook several officers' hands at the Capitol. The evidence does not support those claims. Moreover, in a lengthy diatribe, she falsely claimed that January 6 was a "set-up," and that officers let the rioters into the Capitol, minimized and deflected blame for her own misconduct, and portrayed herself as an ally to the very officers she assaulted:

> Soon as they opened them doors that's when the cops let everybody in. As soon as that happened, they stopped the proceedings and then when they came back, they certified the vote. **It was a freaking set up. The whole thing was a freaking set up. It was a set-up.** By law, by Constitutional law they have a Senator's signature on an objection, they have

to do a special proceeding and they didn't do it because of the breach. Because people went into the freaking Capitol. You've seen it, you've had to of seen the reels where they moved the things out of the way and officers waved the people in. You had to have seen them . . . I went into the Rotunda and there was cops lined up on both sides of the stairs in there with us and I was talking to the cops most of the time and the lieutenant was pepper sprayed and I was pouring water over his face . . . they even told me and this other guy you got [referring to Davis] to sit and wait and they were like make room for two . . . when they got everybody out of the Rotunda. They got everyone out first then they let us out. And there was a stomper on the damn door and the door wouldn't shut. And there were two sets, two sets of officers there. There was the normal Capitol Police and then there was another set of officers . . . The normal Capitol Police I believe . . . I was talking to them and one girl . . . had tears coming down her eyes, she was like 'I know, I know' and the other guy was like 'I'm with ya, I'm with ya, but' and I was like 'do your job, do your job I get it, I get it' you know? And anyways we come out of the Rotunda and there was a door stomper stopping the door and there was people trying to get back in and I was sitting there trying to get the door stomper out of the way and the guy pepper sprayed me . . . And I was like 'What did you do that for?' and then I'm still trying to get the door stop because there's people trying to pull the door back open and he pepper sprayed me again and by then it knocked me on my ass and then the other officers I was talking to said 'Somebody help her' because I was sitting outside . . . it was a freaking set-up. **It was a set up.** And not to, Trump too, he should have in his speech been very clear . . . do not go in . . . I'm not blaming him, I don't blame him . . . There were agents, Jeff Epps why isn't he in jail? He's an FBI agent and he was the one saying 'go in, go in' and he was the one the night before telling people to 'go in, we have to go in' and he's an FBI agent. I'm telling you there's good ones, but there's a handful of shit bags that are going along with this destroy America agenda and it's the top, it's at the very top . . .

## III.    THE CHARGES AND PLEA AGREEMENT

On June 24, 2024, the United States filed an information charging Bishop with one count of Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1). On August 19, 2024, Bishop pleaded guilty to that offense.

## IV.    STATUTORY PENALTIES

Bishop now faces sentencing for one count of Assaulting, Resisting, and Impeding a Federal Officer in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation

Office, Bishop faces up to 8 years of imprisonment, a fine of $250,000, and a term of supervised release of not more than 3 years.

## V. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As stated in the PSR and the plea agreement, the parties agreed to the below Guidelines analysis. PSR ¶ 6.

Count Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

| | |
|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **17** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated Bishop's criminal history as category III, which is not disputed. PSR ¶ 72. Accordingly, Bishop's Guidelines imprisonment range is 30 to 37 months. PSR ¶ 129.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

---

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bishop's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Bishop stormed into the Capitol building with Davis and actively added to the chaos and disorder inside the Rotunda area. Bishop grabbed an officer's baton, helped rip a riot shield from an officer's hands, and tried to force her way back into the Capitol after being expelled by police. Bishop also encouraged other rioters to continue storming the Capitol through a megaphone on the East Front. The nature and circumstances of Bishop's offense are of the utmost seriousness, and fully support the government's recommended sentence of 24 months of incarceration.

### B.  Bishop's History and Characteristics

Bishop is unemployed and receives Social Security Income. PSR ¶¶ 116–117. She is the primary guardian for her 9-year-old twins, who she home schools. PSR ¶ 100. Her children's father has custody every other weekend. PSR ¶ 100.

As the PSR shows, Bishop's assaultive conduct on January 6 was not an isolated event in an otherwise law-abiding life. She earned criminal history points from an armed robbery conviction in 2010 and a possession of stolen goods conviction in 2017. She also has a history of assaults. However, none of Bishop's other criminal justice contacts add any points to her criminal

history category, and most stem from the mitigating information provided in the PSR. The government recognizes that Bishop's significant child and adulthood trauma, coupled with the drug addiction and mental illness that followed, led her to have frequent run-ins with the criminal justice system. *See* PSR ¶ 93–98, 107–113. Because the government credits Bishop's account of her history of abuse and the long-term impact it has had on her, the government believes a below-Guidelines sentence of 24 months is appropriate. The government also notes that Bishop's crimes on the 6th were committed with Davis, whom she traveled with to the Washington, D.C., and who also assaulted others that day.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bishop's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. As discussed above, the crime was of an unprecedented nature. Thus, the need to promote respect and deter future crime is equally important. The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[7]

If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

### *Specific Deterrence*

The need for the sentence to specifically deter Bishop also weighs heavily in favor of a term of incarceration. Given her history of criminal conduct, along with the nature of her offense on January 6, 2021, Bishop has demonstrated a clear disrespect for and unwillingness to comply with the law. Her sentence must be sufficient to provide specific deterrence from Bishop committing future crimes of violence.

Moreover, though Bishop indicated in her statement to the probation officer that she is, at least to some extent, remorseful, that statement—along with any statement she makes at sentencing—should be taken with a grain of salt, especially given the statements she made at the time of her arrest. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[7] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s]

and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious,

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The best comparator in this context is typically one's co-defendant (in this case Curtis Davis). In *United States v. Curtis Davis,* 24-cr-198 (APM), this Court sentenced Davis to 24 months' incarceration followed by 36 months' supervised release (with the first 6 months on home detention), compliance with substance abuse and mental health treatment, 100 hours of community service, and $2,000 in restitution. Bishop stormed into the Capitol building with Davis through the East Rotunda Doors. Like Davis, Bishop assaulted, impeded, and interfered with police officers in the Rotunda, at one point grabbing an officer's baton. She and Davis refused to leave the Rotunda and resisted police efforts to clear them every step of the way. At one point, Bishop grabbed onto an officer's shield. She and other rioters, including Davis, eventually ripped it from the officer's

seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

hands, and Davis then used it to push back against the police line. Even after being expelled from the building, Bishop and Davis tried to force their way back inside despite police officers blocking them. However, Davis was unquestionably more violent than Bishop. Davis's violence and criminal history drove the government's 48-month recommendation – a recommendation the government stands by. Nonetheless, the Court's variance is a helpful comparator to Bishop. While Davis was more violent, both have criminal histories, and Bishop's statements after her conduct illustrate a concerning lack of appreciation of the nature of the crime. While no comparison is perfect, in light of the compelling history and characteristics present here, the Court's prior sentence of 24 months establishes an important benchmark. Here, a 24-month sentence balances significant conduct, significant criminal history, but tragic personal circumstances that explain (but perhaps not excuse) the conduct in question.

Another helpful comparator is *United States v. Dana Jean Bell* 24-cr-271 (TJK). In that case, Bell shook bike rack barricades on the east side of the Capitol while giving police the middle finger and repeatedly yelling "fuck you" at them. She then ignored flashbangs and pepper spray as she made her way to the very front of the mob on the east side. There, Bell helped hold open the East Rotunda doors, including while police were pinned behind it trying to close it. After throwing a stanchion in the Rotunda across the floor, she screamed in officers' faces while they tried to render aid to a rioter who had been shot. Bell then proceeded to verbally and physically assault at least two MPD officers as they funneled her out the Upper House doors. She pleaded guilty to one count of 18 U.S.C. § 111(a)(1) and was sentenced to 17 months incarceration, 36 months' supervised release, and $2,000 restitution. Because Bishop has a more significant criminal history

than Bell and engaged in more assaultive conduct on January 6, a higher sentence is appropriate, even contextualizing the mitigation as described.

Also worth considering is *United States v. Kyler Bard,* 23-cr-84 (APM). In that case, Bard walked on top of the short wall and carried a megaphone on the Upper West Terrace of the Capitol. Shortly thereafter, another rioter near Bard charged the police line and pushed into the officers. In response, Bard yelled into the megaphone, "Move! Move! Move! We gotta push! We gotta push! Let's go! We gotta go! Let's go! Bard then turned directly toward the police line, and, as he yelled "let's push!" he lowered his shoulder and pushed his body weight into an a MPD police officer on the line. Other officers repelled Bard's assault, and he fell backwards, continuing to resist and push against the victim officer until Bard fell to the ground. As Bard fell backwards, he yelled to the officers, "You're all a bunch of pieces of shit." He then he got up and retreated back into the crowd. In that case, this Court sentenced Bard to 12 months and 1 day of incarceration, 24 months' supervised release, 120 hours of community service, and $2,000 restitution.

Much like Bard, Bishop used a megaphone to incite the crowd. In addition, both Bard and Bishop assaulted officers by pushing into a police line. However, the total duration of Bard's assaultive conduct was approximately 15 seconds. Bishop, on the other hand, engaged in a spree of violence against officers in the Rotunda and at the East Rotunda Doors, lasting about 35 minutes. During that time, she pushed up against police lines, grabbed onto an officer's baton, and another officer's shield, continually resisted police efforts to remove her and the other rioters from the Rotunda and East Rotunda Doors, and then tried to force her way back inside after she was removed. She and Davis greatly contributed to the chaos in this area during that time. Further

justifying a higher sentence than Bard, is the fact that he had zero criminal history points, while Bishop has a significant – albeit mitigated – criminal history.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078–79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim officers did not suffer bodily injury as a result of Bishop's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bishop must pay $2,000 in restitution, which reflects in part the role Bishop played

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

in the riot on January 6.[11] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Bishop's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 123.

The $2,000 restitution payment fairly reflects Bishop's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Bishop was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

Bishop's conviction for violation of 18 U.S.C. § 111(a)(1) subjects her to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Bishop's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Bishop to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, Bishop has shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court should not impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    *s/ Kyle R. Mirabelli*
Kyle R. Mirabelli
Assistant United States Attorney
NY Bar No. 5663166
Capitol Siege Section
U.S. Attorney's Office
District of Columbia
Telephone No: (212) 252-7884
Email Address: kyle.mirabelli@usdoj.gov